Campbell, Chief Justice,
delivered the opinion of the court:
The Bureau of Supplies and Accounts, Navy Department, invited bids for supplying coal at different places, one of them being the naval training station at Great Lakes, Illinois. The prescribed form upon which the proposals were to be made and its accompanying conditions, and the general specifications which also went along with the form of proposals, were elaborately drawn. It seems manifest that they were not drawn with reference to fuel alone, but covered other subjects. The Paymaster General of the Navy, who -was also Chief of the Bureau of Supplies and Accounts, issued the invitations for bids, which were sent to different persons and to plaintiff. He called attention to the purpose of the Navy to return to the system of competitive bidding, and notified the suppliers that if the proposed conditions in the schedules were unsatisfactory to them they were requested to submit bids upon conditions they deemed satisfactory.
After receipt of the invitation to bid, but before making any bid, the plaintiff, on March 2,1920, informed the Bureau of Supplies and Accounts that under the original specifications it would not feel warranted in bidding because it did not appear that a change in miners’ wages was taken care of, *716 but that in view of tlie department’s notice that bidders might insert conditions it might make a bid upon these conditions. It did not commit itself on this, score until after the Paymaster General’s reply a few days later, .which informed plaintiff that the question of change in miners’ wages was taken care of by clause (d), paragraph 25 of the schedule, and that plaintiff should not hesitate in making its bid because of any supposed uncertainty as to the effect upon the price of any wage increase. This information was repeated in a later communication to plaintiff and others invited to hid hv the Paymaster General. With these assurances plaintiff sent forward its proposal on the designated form, choosing to submit the same under the heading in the form of “Alternate bids.”
The form provided for six alternate bids numbered A, B, C, D, E, and F, and plaintiff’s bid was under alternate bids D and F, the one for 33,000 tons of coal and the other for 75,000 tons of run-of-mine coal. Uuder each of the headings in the schedule, C, D, E, and F the description of the tonnage was followed by the phrase “ except that the method of determination of the price as outlined in paragraph 25 of the general specifications will not apply.” The effect given to this clause when plaintiff’s bills because of an increase in miners’ wages were presented and the consequent refusal to pay the increase furnish the reason for this suit. Plaintiff had to pay an increase of miners’ wages during the life of the contract, and having been refused reimbursement for them, sues, and asks that if deemed necessary the court will reform the written contract. There can be no doubt that the Government officers who had charge of the invitations for bids, and of the contract, understood that plaintiff’s contract provided for the very contingency that happened and that plaintiff so understood the situation. .
When the whole of the specifications is taken together, and when the evident purpose of “ alternate bids ” is considered, it is not clear that the clause we have quoted from the alternate bids was meant to exclude alternate bids from the benefits of clause (d). paragraph 25. It will be noted that paragraph 25 had three clauses (a), (b), and (c), which outline methods of determination of price as the coal may be *717 affected by thermal units, ash, or moisture. It also had a fourth clause, (d), which provided that the prices must be net prices, and would be subject to any change on account of subsequent change in wage scale or freight rates when properly substantiated, in which case the prices stated would he modified or revised accordingly. Whether the first three of these clauses which outline methods of determining the price based upon British thermal units in the coal and its ash and its moisture are what is referred to in the “ alternate bids ” when they “ except the method of determination of price as outlined in paragraph 25,” or whether this clause also refers to clause (d), presents something of an ambiguity, to say the least.
There was good reason for excepting from the operation of the alternate bids the clauses (a), (b), and (c), because the purpose of the latter bids was to secure conditions satisfactory to the suppliers without binding them to the strict terms of the Government's invitation. But to allow the change in miners’ wages or freight rates to affect and increase the price of coal supplied under the Government’s conditions and to deny a like increase to those making an alternate bid would be to discourage any alternate bids, notwithstanding the invitation itself asked for such bids. This condition of the written instrument furnishes additional reason for the court’s conclusion. The facts are undisputed. We have referred to what transpired before plaintiff’s contract wras made. The clause (d), paragraph 25, according to the facts found, was not intended to be a part of that paragraph. Newr forms place it in a. separate paragraph. When after the contract was made there was an increase of miners’ "wages, which increased the cost of production, plaintiff demanded the payment of this increase. The propriety of making it was plainly recognized by the bureau. .
An “ advance ” opinion by the comptroller was sought. That official was informed of the facts as they appeared to the Paymaster General, who stated in his communication that he believed it would be unfair to the plaintiff, “ in an equitable sense, to exclude them from participating in this increase on account of an inadvertence in the printed form of contract which was "wholly due to the fault of the *718 Government." The comptroller ruled that it was apparently admitted that the contract as executed did not authorize payment of the increase of wages as part of the contract price, but that it was urged that an error had been made in the preparation of the contract, and said “ that a simple statement that a clause was erroneously put in the place in which it appears in a contract is not a sufficient reason for me to authorize payment to be made under such contract higher than would be made by giving effect to the contract wiih the clause in the place in which it appears.” That the clause is not in its proper place is made clearly to appear. We need not take issue with the comptroller in his view of the contract as actually written, but this court is authorized to reform a contract. See Ackerlind v. United States, 240 U. S. 531.
The plaintiff was assured the matter of increase of wages was provided for before it submitted its bid; both plaintiff and the bureau directly involved intended that provision should be made in the contract for any increase of wages, and both understood this contingency was taken care of; plaintiff presented its bills upon this theory, and out of an abundance of caution an advance opinion of the comptroller was sought by the bureau. In applying to the comptroller the position and belief of the bureau and of the Secretary of the Navy as well were made plain that these officers thought the plaintiff entitled to be paid, and the Paymaster General explained that the clause in question had been misplaced in the schedule. This latter fact is further confirmed by the subsequent correction of the form itself. The Government’s brief practically concedes a right of recover. These facts present a case for reformation quite as strong as was that of Aeherlind, sufra. To make plain the clearly proved and undisputed intention of both parties to the contract its reformation should be decreed and plaintiff be allowed to recover.
Judgment for plaintiff in the sum of $15,071.42. And it is so- ordered.
Hat, Judge; DowNey, Judge; and Booth, Judge, concur.